## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**UNITED STATES OF AMERICA**          **CASE NO.  6:19-CR-00337-01**

**VERSUS**                            **JUDGE JUNEAU**

**BERNELL GEORGE (01)**               **MAGISTRATE JUDGE HANNA**

### REPORT AND RECOMMENDATION

Before the Court is Defendant's Motion to Suppress. (Rec. Doc. 29). The Government opposed the Motion (Rec. Doc. 32). The Motion was referred to the undersigned magistrate judge for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of this Court.  The Court conducted an evidentiary hearing on March 13, 2020. (Rec. Doc. 47). Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, the Court recommends that Defendant's Motion be denied.

### Factual Background

Defendant was indicted with one count of Possession of a Firearm by a Convicted Felon on November 6, 2019. (Rec. Doc. 1). He appeared and was arraigned on November 20, 2019 and is currently detained pending trial. (Rec. Doc. 9; 21). Defendant filed the instant Motion to Suppress seeking to exclude evidence obtained after a warrantless arrest and search of his vehicle. (Rec. Doc. 29).

The evidence shows that on the night of September 20, 2017, the Lafayette Police Department ("LPD") received a call regarding a suspicious white sedan which had been idling in the parking lot of an apartment complex for over an hour. LPD Officer Andrew Esterly responded to the call at approximately 10:00 p.m. On that night, Defendant had parked his white sedan in a parking space, and, with his vehicle running, was speaking to his sister-in-law's roommate, seated in the passenger seat, and watching videos on his phone. (Rec. Doc. 29-1, p. 1). According to Defendant, suddenly a male figure approached from behind, "surreptitiously snuck up on them," and demanded that the occupants get out of the car. Defendant then realized the individual was a police officer and tried to leave on foot. (Rec. Doc. 29-1, p. 2).

Officer Esterly testified at the evidentiary hearing that he responded to the call regarding a suspicious vehicle parked in the parking lot of an apartment complex on Martin Luther King Drive. (Rec. Doc. 47, p. 10). He described the area as one of high crime with frequent calls for illegal discharge of weapons and narcotics. (*Id*. at 11). The caller described the vehicle as a white sedan backed into a parking spot which had been idling for approximately one hour.  (*Id*. at 10-11).

Upon arrival, Officer Esterly located the white sedan as described backed into an area adjacent to a handicap spot. (*Id*.) He parked his unit about 100 feet away and approached the vehicle from the rear. (*Id*.) Initially, he had his gun drawn. Upon seeing two people inside the car, he holstered his gun, while holding his flashlight,

knocked on the passenger side window, and signaled the occupants to roll the window down. (*Id*. at 12-13). Prior to the passenger rolling the window down, Officer Esterly observed what appeared to be a hand-rolled cigarette in the driver's hand, later identified to be George. (*Id*. at 13-14). Once the window was rolled down, Officer Esterly smelled marijuana and observed what appeared to be a bag of marijuana in the cupholder of the center console. (*Id*.) He then asked George and his passenger to place their hands on the dashboard, but George did not comply. (*Id*. at 14). Instead, he began making "dramatic movements with his hands like he wasn't sure what he was doing." (*Id*.) He appeared to be reaching for the center console towards the bag of marijuana and also under the seat. (*Id*. at 14-15). Officer Esterly again commanded George to put his hands on the dashboard and to turn off the vehicle; again, George did not comply. (*Id*. at 15). Instead, he grabbed the bag of marijuana and fled on foot. (*Id*.) Officer Esterly gave chase briefly before George threw the bag of marijuana on a roof. (*Id*.) George thereafter stopped upon command and was arrested. (*Id*. at 16). Other officers arrived on scene. (*Id*.).  A search of the white sedan revealed the hand-rolled cigarette and a gun under the driver's seat. (*Id*. at 16-17).

Footage from Officer Esterly's body camera begins when Officer Esterly apprehended George, led him to other officers to be placed in a unit, and discovered the bag of marijuana which George had thrown on a roof where it eventually rolled

off and fell onto Officer Esterly. (Rec. Doc. 46, Exhibit 1 and 2[1]). Officer Esterly explained to other responding officers that he had seen George smoking a "blunt" and observed him reach under the seat for a gun rather than put his hands on the dash as instructed.[2] (Rec. Doc. 46, Exhibit 2, Body Cam – Initial Arrest). Footage of the subsequent search of the vehicle and Officer Esterly's explanation to other responding officers corroborates Officer Esterly's testimony. (Rec. Doc. 46, Exhibit 2).

In his post-arrest Affidavit of Arrest, Officer Esterly stated that in responding to a suspicious vehicle complaint, officers made contact with George inside the vehicle; that he became extremely nervous when asked to turn the vehicle off, and then grabbed a bag of marijuana and fled on foot before being apprehended. (Rec. Doc. 45-1). The affidavit does not indicate that Officer Esterly observed a hand-rolled cigarette, that he smelled marijuana, or that defendant appeared to reach under the seat.

---

[1]    Exhibit 1 consists of all available body camera footage. Exhibit 2 consists of snippets of pertinent footage. The Court observed all videos in their entirety but references the snippets in Exhibit 2 for ease of reference.

[2]    Detective Maldonado with the Lafayette Police testified that at the time of this incident in 2017, LPD policy required that body cameras be activated at the time of an arrest or at the officer's discretion if the officer felt that he was "involved in" a particular incident. LPD policy has since been revised to require activation of the body cameras upon any encounter with any member of the public.

Defendant now seeks to suppress evidence obtained following his warrantless arrest and the subsequent search of his vehicle, including the marijuana, the gun, and his statements made to Officer Esterly at the time of his arrest.

## Law and Analysis

Defendant's Motion to Suppress invokes the exclusionary rule, as it seeks to preclude the Government from introducing at trial certain evidence, specifically the firearm discovered during a warrantless search of his vehicle and Defendant's statements made in connection therewith. "The exclusionary rule was created by the Supreme Court to 'supplement the bare text' of the Fourth Amendment, which 'protects the right to be free from 'unreasonable searches and seizures,' but ... is silent about how this right is to be enforced.'" *United States v. Ganzer*, 922 F.3d 579, 584 (5th Cir.), *cert. denied,* 140 S. Ct. 276 (2019), citing *Davis v. United States*, 564 U.S. 229, 231 (2011). The exclusionary rule operates to exclude the prosecution from introducing evidence obtained unconstitutionally. *Id*. Its purpose is to deter officer misconduct, not to redress injury to the victim of a constitutional violation or to address judicial errors or misconduct. *Id*., citing *Davis v. United States*, 564 U.S. 229, 236-37 (2011), and *United States v. Leon*, 468 U.S. 897, 916 (1984).

Generally, "the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993). In cases

such as this, where the officer acted without a warrant, the Government bears the burden of proof. *United States v. Castro*, 166 F.3d 728, 733, fn. 6 (5th Cir. 1999).

The Fifth Circuit has recognized three types of encounters between officers and individuals: 1) a consensual encounter during which an individual voluntarily agrees to communicate with the police; 2) a limited investigatory stop based upon less than probable cause; and 3) an arrest which constitutes a seizure under the Fourth Amendment. *United States v. Williams*, 365 F.3d 399, 403–04 (5th Cir. 2004), citing *United States v. Cooper,* 43 F.3d 140, 145–46 (5th Cir.1995). The Government first argues that Officer Esterly's interaction with Defendant was consensual until Officer Esterly developed probable cause. Alternatively, the Government argues that a permissible investigatory stop precipitated the arrest.

## I.    Whether Officer Esterly and George's interaction was consensual.

The Government first contends that Officer Esterly's interaction with George was consensual, such that George was not seized, and the Fourth Amendment was not triggered, until such time as Officer Esterly developed probable cause.

> Under the consensual encounter arm of Fourth Amendment jurisprudence, the police can initiate contact with a person without having an objective level of suspicion, during which time the police may ask questions of the person, ask for identification, and request permission to search baggage that the individual may have in his possession. *United States v. Drayton,* 536 U.S. 194, 200–01, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). The Supreme Court has recognized that the Fourth Amendment "permits police officers to approach bus passengers at random to ask questions and to request their consent to searches, provided a reasonable person would understand that he or she

6

is free to refuse." *Id.* at 197, 122 S.Ct. 2105. In deciding if an encounter between the police and a private citizen is consensual, the district court must determine if a reasonable person in the circumstances described would feel free to disregard the officers and proceed with his or her own business. *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

*Williams*, 365 F.3d at 404.

See also *Bostick*, 501 U.S. at 434 (1991), citing *Florida v. Royer,* 460 U.S. 491, 497 (1983) ("[W]e have held repeatedly that mere police questioning does not constitute a seizure, [and] 'law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.'"). Factors the court has considered in determining whether the officer and the defendant were engaged in a consensual encounter include whether the officer has shown or used any force, engaged in intimidating movements, brandished a weapon, blocked an exit, or uttered any threat or command. See *Williams*, 365 F.3d at 404.

The evidence shows that Officer Esterly approached George's vehicle on foot. He had parked his unit approximately 100 feet away where the vehicle occupants could not see it. (Rec. Doc. 47, p. 11; 33). Although he had initially drawn his weapon, upon seeing occupants inside the vehicle, he holstered the gun, held his flashlight in one hand, and knocked on the window with the other. (*Id.* at 12-13).

Although Officer Esterly testified that his gun was holstered at that point, post-arrest body camera footage captured statements suggesting that Defendant could have seen Officer Esterly's gun. (Rec. Doc. 46, Exhibit 2, Gun Recovery Body Cam, Time Stamp 3:18:23Z).

Perhaps Officer Esterly intended to create a consensual encounter upon approaching the vehicle; however, George's failure to comply with Officer Esterly's instructions suggest the encounter was not consensual. In other words, George did not voluntarily cooperate with Officer Esterly so as to render the encounter consensual. See *Bostick*, 501 U. S. at 438. Compare *United States v. Fernandes*, 285 Fed.Appx. 119 (5th Cir. 2008), wherein officers knocked on the defendant's door and asked if they could speak with him outside. The officers were not in uniform and unarmed, and the defendant was not physically or verbally restrained. *Id*. at 123. The defendant fully cooperated with the officers. *Id*. Here, George did not at any point cooperate. Thus, the Court finds that the initial encounter was not consensual.

## II.    Whether the encounter was a permissible investigatory stop.

The Government next argues that Officer Esterly's encounter constituted a permissible investigatory stop supported by reasonable suspicion. The constitutionality of investigatory stops has been thoroughly analyzed by the United States Supreme Court and the Fifth Circuit since *Terry v. Ohio*, when the Supreme

Court announced a "very narrow exception" to the warrant requirement. *Terry v. Ohio*, 392 U.S. 1 (1968). The following analysis is applicable here:

> While the Fourth Amendment generally requires officers to obtain a warrant before searching or seizing an individual, under the "very narrow exception" announced in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), police officers may briefly detain a person for investigative purposes if they can point to "specific and articulable facts" that give rise to reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime. *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). Although "reasonable suspicion" is more than a "mere hunch," it "need not rise to the level of probable cause." *United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008) (quoting *United States v. Lopez–Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)). An "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an intrusion into the privacy of the detained individual. *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. To find that reasonable suspicion existed to justify a stop, a court must examine the "totality of the circumstances" in the situation at hand, in light of the individual officers' own training and experience, and should uphold the stop only if it finds that "the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

> *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017).

Further, "[a]ny analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999).

An anonymous tip may give rise to reasonable suspicious for a *Terry* stop. Although, "an anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity," "under appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Navarette v. California*, 572 U.S. 393, 397 (2014), citing *Alabama v. White,* 496 U.S. 325, 327; 329 (1990). The question in a case such as this is whether "the call bore adequate indicia of reliability for the officer to credit the caller's account." *Id*. Evidence indicating that the caller was an eyewitness to the alleged wrongdoing entitles the tip to greater weight. *Id*; *Illinois v. Gates,* 462 U.S. 213, 234 (1983)). ("[An informant's] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.") Facts suggesting that the caller relayed the information contemporaneously with the alleged wrongdoing are also especially reliable. *Navarette*, at 572 U.S. at 399-400. However, even a reliable tip must give rise to reasonable suspicion of some wrongdoing. *Id*.

Officer Esterly testified that he responded to a call from dispatch regarding a "suspicious vehicle complaint." (Rec. Doc. 47, p. 10-11; 55-56). The caller provided that a white sedan had been idling in the parking lot for approximately an hour. (*Id*.) Upon arrival, Officer Esterly observed the white sedan parked as the caller had indicated, and body camera footage suggests the caller was a neighbor in the

apartment complex. (Rec. Doc. 46, Exhibit 2, Body Cam – Initial Arrest). These facts weigh in favor of the caller's reliability.

The trickier question is whether information that a "suspicious vehicle" had been idling in a parking lot for approximately one hour gives rise to reasonable suspicion of some wrongdoing, when Officer Esterly had no specific facts about why the vehicle was "suspicious." Officer Esterly testified that the apartment complex in question was a high-crime area (Rec. Doc. 47, p. 11); however, he also testified that the complex did not have a "no loitering" policy in place at that time (*Id*. at 56). Neither has the Government identified any statute or ordinance which prohibited loitering at this location. Thus, the Government has not shown that George and his passenger could have been guilty of loitering. Indeed, Officer Esterly testified that the fact that the vehicle was backed into a parking space was not significant in evaluating whether the vehicle was suspicious. (Rec. Doc. 47, p. 56).

Rather, the Government relied upon the fact that George's vehicle was parked partially on the line for an adjacent handicap parking space. Officer Esterly's body camera footage depicts the white vehicle parked adjacent to a handicap spot, possibly in the loading zone, with its rear passenger wheel on the line for the parking space. (Rec. Doc. 46, Exhibit 2).

La. R.S. 40:1742(B)(1) states: "No person shall park any vehicle in an accessible parking space unless such person has a license plate or hang tag for

persons with mobility impairments." The statute further authorizes officers to issue citations for violations; however, the Court is not convinced that the act of parking on the line of a handicap parking space (assuming George did not have the appropriate license plate or hang tag) constitutes parking in the actual space, as addressed by the statute. Therefore, the Court cannot say that George's act of parking partially on the blue line, alone, supports a finding of reasonable suspicion for an investigatory stop.

The Fifth Circuit has not yet considered whether identical facts as those in this case constitute reasonable suspicion; although, *United States v. Hill* is worthy of comparison. *United States v. Hill*, 752 F.3d 1029 (5th Cir. 2014). In *Hill* the court found that a multi-car convoy of multiple officers who were "just kind of patrolling around" for criminal activity lacked reasonable suspicion to conduct an investigatory stop of the defendant, whose passenger exited the vehicle upon seeing police and walked quickly towards an apartment. *Id*. The court reasoned:

> The government attempts to put an ominous gloss on what appears almost entirely ordinary. The general picture that emerges, considering all relevant factors together, is of a man and a woman sitting in a car parked in the lot of an apartment building, on a weekend night, at the moment the police arrived. Hill and his passenger "were not offending any traffic ordinance; there was no evidence of recent crimes in the neighborhood, no reason to suspect that [Hill] or his passenger were wanted by the police, and no other reason to believe that anything unusual was taking place."

> *United States v. Hill*, 752 F.3d 1029, 1034 (5th Cir. 2014) (citation omitted).

12

Also notable is *Gonzalez v. Huerta*, a §1983 case in which the court expressed "serious doubts" that an officer had reasonable suspicion to detain the complainant who was parked in a school parking lot to pick up his wife based on a "bare report of a 'suspicious' vehicle." *Gonzalez v. Huerta*, 826 F.3d 854, 857 (5th Cir. 2016). Although there had been earlier reports of vehicle burglaries, the officer was not aware of any information connecting the vehicle to the burglaries. *Id*. "Rather, [the officer] encountered the basic scenario of a reportedly suspicious person in an area where criminal activity had occurred in the past—a scenario that does not support the conclusion that a particular individual is engaged in criminal conduct." *Id*.

Although George and his female passenger were sitting in a vehicle parked at the apartment complex where the female lived, a seemingly ordinary scenario not otherwise indicative of wrongdoing, a key difference between this case and cases such as *Hill* and *Gonzales* is the absence of a Fourth Amendment search or seizure *prior to* the officer's development of reasonable suspicion or probable cause. Fourth Amendment protections do not apply until an individual has been unreasonably searched or seized. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 20. "[A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a

governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*" *Brower v. Cty. of Inyo*, 489 U.S. 593, 596–97 (1989) (emphasis in original). A subject who does not yield to an officer's show of authority has not been seized. *California v. Hodari D.,* 499 U.S. 621, 626 (1991). The question in a case such as this is "whether the officers had reasonable, articulable suspicion to stop him based on what they had observed up until that moment." *United States v. Darrell*, 945 F.3d 929, 933 (5th Cir. 2019).

In *Hill*, "[o]nly a matter of seconds elapsed between the officers' seeing Hill's car and [an officer's] seizure and frisk of Hill." *Hill*, 752 F.3d at 1034. The officers' seizure was not based on any specific reason *at that time* to suspect criminal activity. *Id*. Similarly, in *Gonzales*, the officer arrested the complainant based solely upon a suspicious vehicle complaint and knowledge of prior burglaries in the area. *Gonzales*, 826 F.3d at 857.

In contrast, Officer Esterly testified that upon approaching the vehicle he observed a hand-rolled cigarette and what appeared to be a bag of marijuana in the center console cup holder. (Rec. Doc. 47, p. 13-14). He also smelled marijuana coming from the vehicle. (*Id*. See also Rec. Doc. 46, Exhibit 2, Gun Recovery Body Cam). Up to this point, Officer Esterly had not yet seized George. (Indeed, George,

14

who did not comply with Officer Esterly's commands, was not seized until Officer Esterly apprehended him after he fled.) Officer Esterly's observation and smelling of marijuana constituted reasonable suspicion to detain Defendant for further investigation. *United States v. McSween*, 53 F.3d 684, 686–87 (5th Cir. 1995). See also *United States v. Reed*, 882 F.2d 147, 149 (5th Cir. 1989).

When Defendant failed to comply with Officer Esterly's commands to place his hands on the dashboard and instead reached under the seat, Officer Esterly's reasonable suspicion was further justified. In a factually similar case, *United States v. Brown*, 209 F. App'x 450, 453 (5th Cir. 2006), officers approached a vehicle which had been parked in an apartment complex for some time and observed the occupants bend down as if to hide something upon the officers' approach. The Fifth Circuit held that reasonable suspicion of possible criminal activity justified the officers' search of the vehicle. *Id*. See also *United States v. Watson,* 953 F.2d 895, 896–97 (5th Cir.1992), wherein a vehicle occupant's movements "as if to conceal or retrieve something on the car floor" justified the officer's search; and *United States v. Colin,* 928 F.2d 676, 678 (5th Cir.1991), wherein the occupant's "unusual movements" of "stooping down and moving from side to side," justified the officer's reasonable belief that the occupant was armed, warranting a *Terry* frisk.

Defendant contends that Officer's Esterly's initial approach of the vehicle, when George was not doing anything wrong, was unlawful at the outset and

therefore negates the validity of all subsequent actions. The Court disagrees. Although George may not have been doing anything obviously illegal, Officer Esterly was obligated to investigate the suspicious vehicle complaint. Officers cannot ignore or automatically dismiss such calls simply because there are no immediately obvious signs of wrongdoing. To do so would be in derogation of their duty to serve the public. This scenario may be analogized to the "knock and talk" strategy, which is an investigative strategy which officers use to identify occupants at a location and discuss complaints of possible illegal activity therein. See discussion in *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001). This investigative strategy is not inherently unreasonable. *Id*.

In *Jones*, the court sanctioned the officer's use of the strategy as a "reasonable investigative tactic under the circumstances," "[b]ecause the officers were not convinced that criminal activity was taking place and did not have any reason to believe that the occupants were armed." *Id*. at 721. See also *Fernandes*, *supra*, wherein a "knock and talk" led to a consensual encounter. Here, Officer Esterly approached the white sedan as part of his investigation of a neighbor's suspicious vehicle complaint and knocked on the window to question the vehicle's occupants. The Court finds this was a reasonable investigative tactic, although George chose not to cooperate. Once Officer Esterly observed and smelled marijuana and observed

George's movements of reaching under the seat instead of complying with his instruction, Officer Esterly had at least reasonable suspicion to detain George.

Unlike the circumstances in *Hill* and *Gonzales*, the totality of the circumstances at the time of George's seizure justified Officer Esterly's actions. Officer Esterly had reasonable suspicion (based upon his observation and smell of marijuana, George's furtive movements, and George's flight) at the moment George was detained. The subsequent seizure of the marijuana and gun were obtained pursuant to a valid search incident to arrest.[3] Hence, the Court finds that no constitutional violations occurred.

## Conclusion

For the reasons discussed herein, it is recommended that Defendant's Motion to Suppress (Rec. Doc. 29) be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed. R. Crim. P. 59(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after

---

[3]    "Although the Fourth Amendment generally prohibits warrantless searches, '[i]t is well settled that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.' Incident to a lawful arrest, the police may search: the arrestee's person; any items or containers that were located on the arrestee's person at the time of the arrest; and any items or containers that were located within the arrestee's reaching distance at the time of the arrest." *United States v. Curtis*, 635 F.3d 704, 711–12 (5th Cir. 2011) (Citations and internal quotations omitted.)

17

being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Crim. P. 59(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. §636(b)(1).

THUS DONE in Chambers, Lafayette, Louisiana on this 7th day of May, 2020.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE